[No. 13420. Department One. August 16, 1916.]

REX S. ROUDEBUSH, *Respondent*, v. MILDRED GANNON *et al.*, *Appellants.*[1]

APPEAL—REVIEW—PLEADINGS—AMENDMENT. In cases tried by the court, with the whole record up on appeal, the pleadings will be deemed amended to conform to the proof.

CONTRACTS—EXECUTORY CONTRACT—PROOF. Oral evidence of an executory contract for support in consideration of an assignment of all interest in an estate should clearly preponderate or be clear, cogent and convincing.

CONTRACTS—CONSIDERATION—EXECUTORY CONTRACT—PERFORMANCE. An assignment by a man seventy years of age of all interest in his wife's estate in consideration of an agreement for life support was without present consideration and revocable for repudiation, where it appears that he was a drunkard to the knowledge of the assignee, who claimed the agreement was to keep him as long as he behaved himself and kept sober, and who turned him out within a week for drunkenness and refused to allow him to return, since there was no substantial performance.

Appeal from a judgment of the superior court for Pierce county, Clifford, J., entered September 28, 1915, upon findings in favor of the plaintiff, in an action to vacate the assignment of an interest in the estate of a decedent, tried to the court. Affirmed.

*S. G. Murray* and *Winfield R. Smith*, for appellants.

*Rex S. Roudebush*, for respondent.

CHADWICK, J.—George Tobin and his wife, Lorency Tobin, had lived for some time prior to July, 1914, at the soldiers' home at Orting. In June, 1914, Mrs. Tobin went to Spokane, where the family had formerly resided, for her health. She died on the 12th day of July. Mrs. Gannon, one of the

[1]Reported in 159 Pac. 680.

appellants, a niece who had been raised by the Tobins, was summoned from Missoula, Montana, and Mrs. May Lambley, another niece, was summoned from Orting. The two women met at the Arlington hotel in Spokane on the morning of the 15th.

Tobin had, for many years, been addicted to the inordinate use of intoxicating liquors, and had become so intoxicated that he had been put in the city jail, where he spent the night of the 14th. Shortly after the meeting of the two women, Tobin was brought by an old friend of the family to their room, where he was kept under surveillance during the day, or until the funeral of Mrs. Tobin, which was held in the afternoon. When brought to the room, Mrs. Gannon greeted Tobin in an affectionate way and immediately suggested, as she had never known a mother other than her aunt or a father other than him, that the body of her aunt be buried at Missoula, and that he make his home with her. Mrs. Gannon says she made a contract with Tobin at that time to give him a home in consideration of the money which had been accumulated by the Tobins in Mrs. Tobin's lifetime. Her version of the contract is as follows:

"The contract was that he should have his home with me when he so desired, and he was to remain sober and conduct himself properly, and in consideration of my giving him a home and furnishing him with whatever clothes and food he might need, this money was to be turned over to me and given to me. He said that his pension money would give him all the money he needed, and that probably he would want to stay at the soldiers' home or with his people back east as much or more than he did with me.

"He wanted to live with us and make his home there, whenever it suited him, as I was the chosen one of all his relations. He said that he wanted me to have all of this $3,500 because I was nearer and dearer to him than anyone else. He also said that if I would let him live with me when he so desired and make his home there that he would not drink and become intoxicated, and that he would conduct himself as a gentleman and be a father to me. I agreed to this."

The testimony of Mrs. Lambley, the other niece, is, in substance:

"Mrs. Gannon greeted Mr. Tobin in an affectionate manner, kissed him and took his hand and asked him to have the body shipped to Missoula, Montana, for burial. She talked to him in a persuasive manner and told him he was the only father she knew, and that Auntie was the only mother she had known, and said that he could have a home with them for the rest of his days, and she would take his dead wife's place. He said something about having the remains shipped back east for burial, and she said that that would be too much expense, and he immediately consented to have her remains buried in Missoula, Montana. She got his consent right there, and then he said to her, 'Everything I have is yours.' He was easily persuaded. He was shaky, and suffering from the effects of liquor."

Tobin and Mrs. Gannon left Spokane with the body of Mrs. Tobin on the evening of the 15th, Mr. Tobin, at the time, having the intention of making his home with Mrs. Gannon. Mrs. Gannon says: "He came of his own volition and at my request." On the 17th, Mrs. Gannon and Tobin went to a lawyer's office, where a writing, of which the following is a copy, was signed and acknowledged by Tobin:

"Know all men by these presents, that I, George Tobin, late of the state of Washington, but now of the state of Montana, and the heir and surviving husband of Lorency Tobin, late of Orting, Washington, now deceased, in consideration of the sum of one dollar and of other like and valuable considerations, do hereby and by these presents sell, assign, transfer and set over and convey unto Mildred Gannon of the city and county of Missoula and state of Montana, all of my right, title and interest of, in and to the estate of my said late wife, Lorency Tobin, whether as heir, by succession, will or otherwise, and I hereby duly appoint, nominate and constitute the said Mildred Gannon as my true and lawful attorney, irrevocable, for me and in my name, place and stead to do any and all things that may or that shall necessarily be done in and about the administration of the said estate, and the obtaining of the possession of the same and all assets thereof.

"This conveyance and transfer is absolute and irrevocable, and I hereby waive any and all rights to take out letters of administration or testamentary that I may have now or hereafter.

"Dated at Missoula, Montana, this 18th day of July, 1914.
                        "George Tobin   (Seal)."

On the 20th, Tobin left Missoula and went to Orting. He was drunk when he left and drunk when he arrived at Orting. It would seem that he remained at Orting but a few days. In describing his behavior at Missoula, Mrs. Gannon says:

"He was drunk and intoxicated virtually all the time from July 27th to September 3d, 1914, except possibly the times he was confined to the city jail."

It is said that he behaved himself when sober, but when drunk he used profane and vulgar language and disturbed the peace of the neighborhood and the town; that he would "mess" up the house in "unspeakable ways," and "would become and remain in such filthy personal condition as to be nauseating and offensive to any person."

Tobin left Missoula on September 9th, and came to Tacoma, where his wife's estate was being administered by R. J. McMillan, an attorney at law. Shortly thereafter he went east on a visit to relatives. After his return to Tacoma, he instituted this action to set aside the assignment. He died on September 8, 1915, and Mr. Roudebush was appointed special administrator of his estate. The complaint urges fraud in the procurement of the assignment, in that Mrs. Gannon caused Tobin to become intoxicated and, while so intoxicated, induced him to execute the assignment, and that it was procured without his consent, and "without any consideration whatsoever." These allegations are denied, and to the merit of the case, appellants plead:

"That notwithstanding said continued condition on the part of the complainant, the defendants herein treated him with kindness, consideration and affection and gave to him the greatest care and attention; that the defendants herein

have at all times been and still are ready, willing and anxious that he should come and remain in the home of these defendants, have their care, protection, nurture and attention, so that they might house, clothe, feed and care for him as a member of their own family, and that they have at all times since the execution and delivery of said instrument or assignment, been ready and willing and are still ready and willing to receive and take care of the said complainant in accordance with the terms of said contract and to fully, completely and adequately perform the same upon their part, and to discharge all of the obligations due from them under said contract and agreement, and that by reason of the premises the said assignment hereinbefore described and mentioned is a valid and subsisting instrument, under which these defendants ought and by right should be permitted to retain whatever benefits have arisen if any, and to perform and discharge the obligations which were imposed by the said contract hereinbefore set forth and described.

"That the complainant herein needs and requires the care and attention of one who is interested in his remaining life, welfare and happiness, and that the same can be bestowed by no other person and in no other way save and except by the defendant herein, through the contract hereinbefore set forth and alleged."

The court refused to find fraud in the procurement of the assignment, but found that there was no present consideration for the contract, and that it had been repudiated by Mrs. Gannon. It is not to be asserted that a present passing of a valuable consideration is necessary to sustain a contract such as is set up by appellants. The contract is most frequently executory in character, but where it depends upon oral testimony as to its terms, the testimony should clearly preponderate, or be clear, cogent and convincing.

The terms of the contract, as testified to by appellants, do not comport with the theory advanced by their answer. Under the pleadings, as will be seen by that which we have quoted, they profess a willingness to keep and care for Tobin, and an anxious solicitude for his welfare. Tobin was about seventy years of age. They knew him. They knew his

habits and his needs. They knew, or should have known, what they were getting into. They had taken him for better or for worse. At the trial, Mrs. Gannon was confronted by her own declarations and admissions contained in letters addressed to Mrs. Lambley and to Mr. McMillan. It will be remembered that Mrs. Gannon gave him money to leave, on or about the 20th of July. It was Tobin's money; the residue of $200 after the payment of funeral expenses. Her letter of Aug. 13, 1914, is as follows:

"Dear Cousin: As this is first opportunity I have had to drop you few lines for some time. *I have certainly had my hands full with that old Tobin. He is here yet. I was surprised when he came back the last time. How in world did he get here? Did you buy his ticket?* He looked as if he beat his way, filthy dirty drunk. He was drunk when he left, drunk when he came back, drunk for week after he arrived here. But he is pretty well sobered up now. Mr. Gannon had to take him in hand and tell where he stood. Mr. G. would not have him arrested so soon after funeral. But look out next time. *Dan won't stand it any more; he was thoroughly disgusted as well as myself.* You and Mrs. Ayer both said he had money when he left there. He didn't have any when he arrived here, not one dollar. Neither did he have any clothes. We had to buy them for him when he left here for Orting. I gave him $46.15, all the money left over from funeral. He raised cane, said he wanted it to live on and *didn't know when he would be back—maybe never. And I hoped never.* He was sober when I handed him the money and promised he would remain so, but he did not. May, has there been a administrator appointed yet? He says a McMillan of Tacoma is temporary administrator. I cannot find out anything. He had me write about his household goods. *But I have quit.* He don't know what he wants. He has made an ass of himself and trying to of us. I have been sick since I came home. *I cannot stand him and his actions. Something disgraceful.* Write soon. I will not neglect next time. Love to all and tell you more next time. From

"Mildred L. Gannon,
"608 West Pine St.,
"Missoula, Mont."

On August 14th, Mrs. Gannon wrote again:

"Dear Cousin: I posted you letter last night. *But since then I have fired old Tobin out of my house.* I expect you will see him in a few days. If you knew what talk he made about you to my husband and myself about you, your husband and children you would not harbor him either. I would not stand his insults for no money on earth. His, Tobin's talk is something awful.

"Love to all. Write soon. Mildred."

And on September 26th:

"Dear Cousin: I don't know whether I answered your letter or not. I have been about crazy with Tobin and then my sister has been here. Just left Wend. Did she stop to see you? Did Tobin go to see you before he left for east? Did he send his trunk to Orting? He left here Sept. 9th, and *I understand left shortly for east. Don't know how long he will remain. But let us pray he will stay.* He nearly drove us crazy and had me in bed half of time. No one wanted him around. *I never want to see him again.* He acted something awful. Turned everyone against him. He has talked terrible about us, you and myself. My husband declares he can never step his foot in his house again. He had good home with us but he could not behave. I hope there will be enough left for a head stone for Aunt Lorety out of estate when settled.

"Well, May, write me. I will try and do better after this. Love to you all, from Mildred L. Gannon,

"12 West Pine St.,
"Missoula, Mont."

In answer to a request for her consent to advancing the expenses for sending Tobin back to Missoula, Mrs. Gannon wrote to Mr. McMillan on December 29, 1914:

"*I cannot do anything for Mr. Tobin. It is useless. Let him go to soldiers' home. Heard he was there.* He cannot get into home in Montana under one year according to law. *It is useless to let him come.* In one week he will want to return to Tacoma."

At the trial the appellants testified that the contract was that they were to furnish a home for Tobin as long as he behaved himself *and kept sober.*

While counsel insists that the judgment of the trial court cannot be sustained because respondent failed in his proof of fraud and undue influence, and that the issue of no consideration has no place in the case, we nevertheless feel that a proper judgment was rendered. In cases tried by the court and having the whole record before us, we follow, wherever it is possible to do so, the direction of the statute and deem the pleadings amended to conform to the proofs. Rem. & Bal. Code, § 307. This rule is more decisive in this case for, upon technical consideration, appellants' present plea that their obligation was dependent upon the promise of Tobin to behave himself and keep sober would have no place in the case either.

Upon the testimony, therefore, we conclude that no present consideration passed for the contract, and that it was, hence, executory; that there was no substantial compliance on the part of appellants, measured either in time or performance, and that it was repudiated by appellants and subject to repudiation on the part of Tobin, an act evidenced by the bringing of this suit. It would be a harsh doctrine, indeed, that would bind a man of seventy years to a promise to break the habit of a lifetime in consideration of a home and habitation that he had never known, in place of a home and living at the Soldiers' Home, where he had been for years and, as we must presume, remained contentedly. Granting that he did so promise, appellants knew his infirmity of habit and should have known that in the aged, those of fixed habits, the weakness of the flesh may be—is usually—most powerful to overcome the strength of the spirit.

Affirmed.

Morris, C. J., Mount, Ellis, and Fullerton, JJ., concur.